In re Donny J. SHORT (S.S. # 434–64–7537), Debtor.

MAC SERVICES OF BATON ROUGE, INC., Plaintiff,

v.

Donny J. SHORT, Defendant.

Bankruptcy No. 84–00134.
Adv. No. 84–0099.

United States Bankruptcy Court, M.D. Louisiana.

Feb. 20, 1985.

See also, Bkrtcy., 60 B.R. 951.

Robert S. Leake, Baton Rouge, for defendant.

Jerry W. Lindig, Baton Rouge, for plaintiff.

## REASONS FOR DENIAL OF DISCHARGE

WESLEY W. STEEN, Bankruptcy Judge.

### I. Jurisdiction of the Court

This is a proceeding arising under Title 11 U.S.C. The United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). By order dated August 2, 1984, under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana referred all such cases to the Bankruptcy Judge for the district and ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(J); pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings arising in a case under Title 11 referred under 28 U.S.C. § 157(a), and the Bankruptcy Judge may enter appropriate orders and judgments.

No party has objected to the exercise of jurisdiction by the Bankruptcy Judge. No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

## II. Facts

The Debtor filed this case on February 24, 1984. It is not a joint case; Mr. Short is the Debtor. The Debtor and Mrs. Short are married and live together under Louisiana's community property regime. By virtue of that law, all their earnings for the applicable period are community property and, therefore, are owned equally by Mr. and Mrs. Short. There is no evidence or allegation that any asset relevant to this case was anything other than community property.

On November 4, 1983, the Debtor became unemployed. Prior to that date, he had been employed as a salesman for Home Life. The Debtor had also been involved as an investor with George McCauley in two corporations: M & S Equipment Rental and M & S Oilfield Service. Those businesses did not fare well, and, in 1983, the Debtor faced substantial liability on corporate debt that he had guaranteed as well as with respect to "responsible officer" penalties for employee withholding taxes due the United States. Relations between McCauley and the Debtor deteriorated dramatically during this time. The Debtor's loss of employment in early November was untimely, indeed.

A few days after losing his job, the Debtor borrowed $4,000.00 from a friend, Tony Hobgood, and, according to the Debtor's schedules, secured that loan with a "mortgage" on a "house trailer." With respect to this transaction, the evidence is slightly at variance with the schedules.[1] It appears that the Debtor, Hobgood, and McCauley were each one-third lessees of land on which they placed a mobile home that they used as a fishing camp. The "mortgage" described in the schedules apparently included both the mobile home and the lease, although the schedules only referred to the mobile home. In addition, the leasehold

interest was not disclosed as an asset in the Debtor's schedules. The Debtor testified that he gave the $4,000.00 loan proceeds to his wife and that the funds were deposited in a Telco Credit Union "checking" account (hereinafter the "Telco account"). The Debtor testified that he gave the funds to his wife for disbursement because she paid the bills and because she was better at money management than he. The Debtor also testified that he believed that the funds were deposited in the Telco account because "I think that's the one that she pays bills out of."

A few days later, Mrs. Short paid their attorney $1,500.00 to be held in trust for whatever future legal services he might provide.[2] Mrs. Short testified that she and the Debtor did not then anticipate filing a bankruptcy petition but wanted to be prepared for whatever legal developments might occur. That testimony does not accord with the Debtor's schedules which show in Attachment 3 a $1,500.00 payment on November 30: "Deposited in trust, $750 for bankruptcy representation, $750 to be credited on balance [due] leaving $452.50 due—actual transfer of funds from trust to operating account occurred January 11, 1984, in the amount of $1000."

A few weeks later, about the end of November, Mr. Short received about $3,000.00 in payment of various entitlements due on his termination of employment. He testified that he gave these funds to his wife for deposit to her Telco account for payment of bills.

A few weeks later, the second mortgage on the family residence was refinanced. The proceeds were used first to pay off the existing second mortgage and the remainder (about $8,000.00) was deposited into the same Telco account. Mrs. Short testified that this refinancing was accomplished in

---

1. It was unclear to the Trustee, upon examination, whether the transaction was a mortgage or a sale and it was also unclear to the Trustee whether there was additional property involved, *i.e.,* a lease of the land on which the trailer is located.

2. Mrs. Short testified that this occurred on November 11, 1983. Attachment 3 to the schedules (from the attorney's records) *records* the payment as taking place on November 30, 1983. Considering all the facts and circumstances, the payment was likely made on November 11, and the bookkeeping entry made on November 30.

part to reduce the interest rate on the prior second mortgage and in part to obtain funds to have available "to settle" a dispute with McCauley and to be ready for an IRS claim for delinquent employment taxes and withholding (*i.e.*, 100% penalty). Both the Debtor and Mrs. Short testified that these funds so obtained were actually used to pay bills. Complainant asserts that the bills chosen for payment were those of friends and others who had continuing utility to the Debtor.

■ As noted, the Debtor filed his voluntary petition and schedule of financial affairs on February 24, 1984. The Debtor's schedules are seriously deficient in several respects:

(1) Several community property bank accounts are not mentioned. The Trustee discovered these accounts upon interrogation of the Debtor and recovered $10,321.06 as a result.

(2) There was no reference to Mrs. Short's income or substantial retirement and employee benefits (which, on account of Louisiana community property law, belong one-half to Mr. Short.) Although this property might be exempt, it must be listed and the exemption claimed.

(3) There was a failure to list in the schedules preferential transfers to third party creditors within 90 days of filing.

(4) There was a failure to list in the schedules a preferential payment to the Debtor's mother-in-law.

■ There is no question but that the failure to disclose assets constitutes a concealment of assets. The Court is convinced that the Debtor (as well as his wife who assisted in preparing the schedules) knew about these items and intentionally omitted them from the schedules. The only question is whether there was an "intent to hinder, delay, or defraud" a creditor or an officer of the estate; if so, then the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(2).

With respect to failure to list community property (items 1 and 2 above), the Debtor pleads ignorance. Both the Debtor and Mrs. Short assert that they enjoyed a sort of "homemade community property partition and separation of property"; if they did, it had no effect in law.[3] The Debtor asserts that he only listed property "in his name." But the Debtor showed on Schedule B–1 that he knew how to disclose his interest in community property (even though it may not have been the right way, he demonstrated that he knew at least one effective way.) In addition, as explained more fully below, the Debtor must have known about the Telco account, and his interest in it because he *used* the undisclosed Telco account to pay his bills.

Concerning the failure to disclose the preferential transfers (items 3 and 4 above), the Debtor pleads ignorance. He says his wife did it and that he knew nothing of it.

These assertions are unacceptable. Taking the testimony as a whole, the Court believes that from mid-1983 until February 24, 1984, Mr. and Mrs. Short knew that bankruptcy was inevitable. The Court finds that, with this in mind, and in concert, Mr. and Mrs. Short engaged in a number of financial transactions ·designed to prefer some creditors over others and then to omit those payments from the bankruptcy schedules with at least the objective of hindering or delaying the creditors not preferred. Finally, the Court finds that the same motivation caused the omission of bank accounts from the schedules.

There is no direct evidence of the Debtor's state of mind. The Court infers these conclusions from all the facts and circumstances in evidence:

(1) The Debtor turned over to Mrs. Short the Hobgood loan proceeds ($4,000), the Debtor's severance pay ($3,000 + ) and

3. There is a legal way to achieve an effective partition and separation of property: La.CC Art. 2329, 2336.

loan proceeds of refinancing his home ($8,000 + ). Yet he testified that when it came time to schedule preference payments on his bankruptcy pleadings, he did not know what Mrs. Short did with the money. In addition, after having deposited more than $15,000 into the account "that she pays bills out of," the Debtor did not believe it necessary to list this account in response to question 4 of his Statement of Financial Affairs that asks:

4. Bank accounts and safe deposit boxes.

a. What bank accounts have you maintained, alone or together with any other person, and in your own or any other name within the 2 years immediately preceding the filing of the original petition herein? "(Give the name and address of each bank, the name in which the deposit maintained, and the name and address of every other person authorized to make withdrawals from such account.)"

(2) The Hobgood transaction appears to be an ineffective sham designed to hinder, to delay, or to defraud creditors. The $4,000.00 transaction with Hobgood was characterized as a loan and was repaid to Hobgood by the Debtor post filing. It would not have been valid against the Trustee either as a sale or as a mortgage; as a loan it could logically be "repaid." When it was repaid, Hobgood used $3,000.00 of the repayment proceeds to purchase the property from the Trustee. Although the Debtor testified that he has no repurchase or other agreement with Hobgood concerning the property, the Debtor admitted visiting the camp subsequent to February 24 as Hobgood's guest, and the Court notes that Hobgood did well for himself, though technically being an unintended, unsecured creditor.

(3) Much of the Debtor's testimony and Mrs. Short's testimony is simply not credible. The most substantial example is the failure to list a $2,000.00 preferential transfer to the Debtor's mother-in-law in mid-1983. The Debtor says he did not know about it. The Debtor does admit that he knew about the loan in 1981. The Debtor did not know anything about repayment, yet did not list the debt on his schedules. Mrs. Short says that these were not her schedules, and, therefore, that she was not required to disclose her payments, even though the repayment was made only about seven months prior to bankruptcy, and even though the payment was made with community funds out of the community property account "that she pays bills out of." Mrs. Short admits to assisting in the preparation of the bankruptcy schedules, but she asks the Court to believe that she did not remember paying her mother $2,000.00 and did not review canceled checks from her account to answer the question:

"What repayments on loans in whole or in part have you made during the year immediately preceding the filing of the original petition herein?"

The question also asks specifically for the relationship of the lender if he (or she) is an insider.

These defects in the schedules, taken as a whole in and light of the other approximately contemporaneous transactions, indicate a pattern of irregularities that convince the Court that more than simple error was afoot. The combination of these irregularities with incredible assertions made by the Debtor and Mrs. Short cause the Court to conclude that the necessary culpable intent was present.

■ The Debtor asserts that his absolute cooperation with the Trustee post filing absolves him of any fault for deficient schedules and tends to prove that he did not purposely hide anything. While such conduct probably does tend to disprove fraudulent intent under some circumstances, it is insufficient in this case. The pattern of insolvency planning during 1983 appears so clear to the Court, and the inconsistencies in the case are so substantial, that the ready admission of undisclosed community assets has the opposite effect of that asserted by counsel for the Debtor.

Therefore, discharge is denied. An appropriate order will be entered. For obvious reasons, the Debtor's counterclaim for malicious prosecution is denied.

